**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**DENNIS J. PINE,**

    **Plaintiff,**

**v.**                                            **Civil Action No. 2:04CV31**
                                          **(The Honorable Robert E. Maxwell)**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

    **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant" and sometimes "Commissioner") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); Standing Order No.6.

### I. Procedural History

Dennis J. Pine ("Plaintiff") protectively filed an application for SSI and DIB on June 18, 2002. The Social Security Administration Office received these applications on July 1, 2002 (R. 58-60, 280-283). Plaintiff alleged disability since June 12, 2002, due to hypertrophic

cardiomyopathy,[1] carpal tunnel syndrome, cervical disk herniations, and migraine headaches (R. 58, 85, 280). Plaintiff's applications were denied at the initial and reconsideration levels (R. 41-42, 290). Plaintiff requested a hearing, which Administrative Law Judge Steven D. Slahta ("ALJ") held on May 6, 2003, at which Plaintiff, represented by William M. Miller, Esquire, and James Ganoe, Vocational Expert ("VE") testified (R. 306-24). On July 8, 2003, the ALJ entered a decision finding Plaintiff was not disabled (R. 23-33). Plaintiff submitted new evidence to the Appeals Council (R. 302). On March 8, 2004, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 6-9).

## II. Statement of Facts

Plaintiff was forty-one (41) years old, a person considered to be a "younger person" under the regulations (20 CFR §§ 404.1563(c) and 416.963(c)), at the time of the administrative hearing (R. 58, 308). Plaintiff obtained his high school diploma (R. 308). Plaintiff last worked in June 2002, and he had been employed as a correctional officer (R. 86, 111, 309).

Plaintiff underwent bilateral laparoscopic surgery to repair inguinal hernias[2] on March 1, 2002 (R. 153-54). Susan E. Smith, M.D., the surgeon who performed the procedure, opined on March 7, 2002, during Plaintiff's post-surgery evaluation, that Plaintiff was "doing very well." Plaintiff was instructed to refrain from heavy lifting and to return for an examination in three (3) weeks (R. 152).

---

[1] Hypertrophic cardiomyopathy: a cardiomyopathy, possibly of autosomal dominant inheritance, marked by ventricular hypertrophy, particularly of the left ventricle and often involving the interventricular septum, with diastolic dysfunction manifest as impaired ventricular filling. *Dorland's Illustrated Medical Dictionary* 287 (29th Ed. 2000).

[2] Inguinal hernia: hernia of an intestinal loop into the inguinal canal. *Dorland's Illustrated Medical Dictionary* 813 (29th Ed. 2000).

On March 15, 2002, Plaintiff returned to Dr. Smith with complaints of pain in his left groin. Examination of Plaintiff revealed no erythema, drainage, pinpoint tenderness, or infection. Dr. Smith opined the pain was caused by Plaintiff having "pulled on one of the tacks in this mesh," but that "the inflammation will probably settle down before he comes back" the first week of April 2002. Plaintiff requested Dr. Smith arrange for an MRI of his cervical spine. Dr. Smith secured an appointment for an MRI for Plaintiff for March 28, 2002 (R. 150-52).

On April 2, 2002, Plaintiff returned to Dr. Smith for an examination. She observed he was "doing very well" and had "no complaints" about his post-operative condition. Dr. Smith released Plaintiff to "full activity" (R. 149).

On May 8, 2002, Plaintiff underwent a consultative examination by Richard A. Douglas, M.D., upon referral from Dr. Smith for "cervical pain that radiates to his right shoulder and his left shoulder" and "right trapezius pain and right interscapular pain that radiates to his right upper arm." Plaintiff stated he experienced "tingling" in all his fingers. Plaintiff informed Dr. Douglas that he had successfully treated his symptoms with heat applications and that sitting, standing, and/or walking "intensified" his symptoms. Plaintiff stated he had sought chiropractic care for his condition, but he had "not been involved in any other type of conservative management involving physical therapy or pain management." Plaintiff revealed he was not taking any pain medications and observed his pain was at a level of eight (8) on a scale of one (1) to ten (10) (R. 156).

A review of Plaintiff's systems by Dr. Douglas revealed complaints of shortness of breath and chest pain and right arm pain. Plaintiff's psychiatric, gastrointestinal, renal, and neurological systems were normal (R. 156). Dr. Douglas observed Plaintiff's past medical history was positive for mitral valve prolapse and that Plaintiff's past surgical history included herniorrhaphies in 1991,

3

1996, 2000, and 2002, and carpal tunnel release. Plaintiff informed Dr. Douglas that he was not taking any medications and that he used twelve (12) cans of snuff per week but did not drink alcohol, did not smoke, and did not ingest street drugs (R. 157).

Plaintiff's straight leg raising was negative at ninety (90) degrees bilaterally with negative internal and external rotation of the femur, and his foraminal compression test was negative (R. 157). Dr. Douglas found Plaintiff's motor strength to be 5/5 in all major muscle groups of upper and lower extremities bilaterally. No atrophy or fasciculations were present. Plaintiff's deep tendon reflexes were "2+ and symmetrical throughout upper and lower extremities with downgoing toes." Plaintiff demonstrated "normal finger-to-finger, finger-to-nose, and normal rapid alternating movements" (R. 158).

Dr. Douglas reviewed an April 29, 2002, MRI of Plaintiff's cervical spine. He opined it revealed "an extradural quite large mass that appears to originate from the C5-6 disc space and is producing spinal compression" and "herniated disc on the left at C4-5 which is touching and displacing the spinal cord." Dr. Douglas' diagnosis was for "herniated disc on the left at C4-5 which is touching and displacing the spinal cord and an extradural quite large mass arising from the C5-6 interspace causing spinal cord compression." Dr. Douglas recommended "surgical treatment involving an anterior cervical discectomy and foraminotomy with Allograft and cervical plating at C4-5 and C5-6." Plaintiff "decided to proceed with the surgical treatment" (R. 159).

On May 21, 2002, Plaintiff was to undergo an anterior cervical discectomy and foraminotomy, to be performed by Dr. Douglas. Plaintiff's pre-operative EKG was abnormal; it showed lateral ischemia. Consequently, the surgery was postponed until Plaintiff could obtain cardiac clearance for the surgery. A June 3, 2002, appointment was made with S.M. Reddy, M.D.,

a cardiologist (R. 155).

On June 3, 2002, Plaintiff was examined by Dr. Reddy relative to his lateral ischemia. Dr. Reddy noted Plaintiff complained of chest pain with "no set pattern," shortness of breath, occasional palpitations, and dizziness. Dr. Reddy observed Plaintiff to be "obese" and his blood pressure to be 120/60 and pulse to be 60 (R. 165). Dr. Reddy noted Plaintiff's May 21, 2001, EKG "showed T-wave inversion in lateral leads suggestive of ischemia." He discussed testing options with Plaintiff and, because Plaintiff thought he could walk on a treadmill, ordered a stress echocardiogram test "to rule out coronary disease, cardiomyopathy" (R. 166).

On June 6, 2002, Dr. Reddy corresponded with Dr. Douglas relative to the results of Plaintiff's stress echocardiogram, which, according to Dr. Reddy, showed "evidence of hypertrophic obstructive cardiomyopathy." Dr. Reddy further opined that Plaintiff was "completely asymptomatic from a cardiac point of view." Dr. Reddy informed Dr. Douglas that Plaintiff was able to walk five (5) minutes "with no cardiac symptoms," had "good LV systolic function," and had "moderate concentric left ventricular hypertrophy." Dr. Reddy cleared Plaintiff for surgery "with acceptable risk," and suggested Dr. Douglas "put him on telemetry during postoperative period to avoid dehydration, volume depletion, and tachycardias" (R. 162).

On June 14, 2002, Plaintiff underwent an "anterior cervical discectomy C4-5 and C5-6, placement of five (5) millimeter Allograft, and placement of Dupuy anterior cervical titanium plate and screws from C4 to 6" for "herniated disc at C4-5 and C5-6 with right raduicular pain and two level spinal cord compression." Dr. Douglas performed the surgery (R. 169).

A post-operative evaluation of Plaintiff was performed by Gerardo C. Lopez, M.D., on June 14, 2002. He found Plaintiff's stress echocardiogram showed no ischemia but was positive for "left

ventricular hypertrophy and evidence for a hypertrophic obstructive cardiomyopathy." Dr. Lopez noted that Plaintiff appeared "hemodynamically" stable after his surgery (R. 175). He opined that Plaintiff's neurologic exam appeared "grossly intact" (R. 176).

On September 5, 2002, Plaintiff underwent an internal medicine examination by Kip Beard, M.D., at the request of the West Virginia Disability Determination Service. Plaintiff's chief complaints were heart problems, neck pain, carpal tunnel syndrome, and headaches. Plaintiff stated the following: 1) he had experienced chest pain for "a few years;" 2) the chest pain was substernal sharp to almost dull, occurred two (2) times per week, and lasted fifteen (15) to twenty (20) minutes per occurrence; 3) Plaintiff's chest pain was associated with arm achiness and tiredness; 4) the chest pain occurred following physical exertion; 4) Plaintiff had walked eight (8) miles in the past but only walked one (1) mile currently; 5) his symptoms improved with rest; 6) he experienced neck pain since a 2001 motor vehicle accident; 7) an EMG revealed carpal tunnel syndrome, for which he underwent a right carpal tunnel release in 1996; 8) Plaintiff experienced numbness and tingling in both hands which interfered with his ability to "write or remove bolts or screws"; 9) his hand grip was reduced; 10) Plaintiff was participating in physical therapy; 11) he treated his neck pain with heat; and 12) Plaintiff was afflicted with migraine headaches, which were accompanied by nausea and photophobia and which occurred fifteen (15) times per year (R. 177-78).

Plaintiff reported no shortness of breath, coughing, wheezing, hemoptysis, abdominal pain, nausea, vomiting, bowel changes, or weight changes (R. 178). Dr. Beard observed Plaintiff used no ambulatory aids or assistive devices, walked without a limp, and stood without assistance. Dr. Beard noted Plaintiff was "uncomfortable seated and supine predominantly due to neck discomfort." The examination of Plaintiff's HEENT, neck, chest, and extremities were unremarkable (R. 179-80). Upon examination of Plaintiff's cardiovascular system, Dr. Beard observed "a 3/6 harsh systolic

murmur left of the sternal border without gallop or rub." He noted Plaintiff's heart had a regular rate and rhythm (R. 179).

An examination of Plaintiff's cervical spine by Dr. Beard revealed the following: 1) pain on range of motion testing; 2) tenderness; 3) no appreciable spasm; 4) flexion and extension limited to forty (40) degrees; 5) lateral bending was thirty (30) degrees right and twenty-five (25) degrees left; and 6) rotation was seventy-five (75) degrees right and fifty-five (55) degrees left. The range of motion of Plaintiff's shoulders were normal, but with some neck pain. Examination of Plaintiff's hands revealed no Heberden or Bouchard's nodes, no atrophy, no tenderness, redness, warmth, or swelling. Plaintiff was able to write, button, and pick up coins. Plaintiff's grip strength measured 120, 121, and 105 pounds of force on the right and 110, 110, and 105 pounds of force on the left. Plaintiff's left fourth finger presented with a swan neck deformity "with extension of left fourth DIP, extension limited to 20 degrees and triggering at the left fourth finger." All other ranges of motion of Plaintiff's hands were normal. Dr. Beard observed mild crepitation in Plaintiff's knees, right being greater than left. There was tenderness present at the medial tibial region of the right knee. The right knee flexion was one-hundred degrees and extension was normal; left knee demonstrated normal flexion and extension. Plaintiff's ankles and feet were normal (R. 180).

Dr. Beard's examination of Plaintiff's dorsolumbar spine revealed normal curvature. There was "no evidence of paravertebral muscular spasm and percussion of the lumbar spineous processes [was] not associated with tenderness." Plaintiff could stand on one leg at a time without difficulty and there was no leg length discrepancy. Plaintiff's straight leg raising test was normal to ninety (90) degrees bilaterally in the supine and sitting positions. Plaintiff's forward bending at the waist, extension, and lateral motion of his spine were normal. No tenderness was detected with palpation

of Plaintiff's hips and his hip flexion was normal bilaterally (R. 180).

The neurologic examination of Plaintiff by Dr. Beard revealed diminished light touch in both hands, which was "compatible with median nerve distribution." Tinel signs at the wrists were moderately positive right and mildly positive left. No atrophy was present. Plaintiff's deep tendon reflexes were "1+ biceps, triceps, 2+ patellar and 1+ Achilles." Plaintiff was able to "heel walk, toe walk, heel-to-toe and squat with some neck discomfort but without much difficulty" (R. 180-81).

Dr. Beard's impression was: "Chest pain, with exertional component, cannot entirely rule out angina," with reported history of hypertrophic cardiomyopathy; Chronic neck pain, "status post intercervical discectomy and fusion at C4-5 and C5-6;" Bilateral carpal tunnel syndrome, "status post right carpal tunnel release;" and headaches, "possibly migraine." The following summary of Dr. Beard's evaluation of Plaintiff was offered:

> Examination today does reveal some diminished motion in the neck, well healing right anterior neck scar. Sensory discrepancies in the upper extremities were more compatible with median nerve distribution. No focal motor abnormalities are identified and reflexes seemed symmetric. There is also a history of chest pain. The claimant does have an exertional component to his chest pain and because of this unable to entirely rule out angina. Examination of the heart today reveals somewhat harsh 3/6 systolic murmur left of the sternal border but no appreciable congestive heart failure is present.
>
> The claimant also has a history of carpal tunnel syndrome. . . . Fine manipulation seemed well preserved. The grip strength is mostly preserved.
>
> The claimant also has chronic headaches. . . . Neurologically, I am not able to identify any abnormalities. . . (R. 181).

On September 10, 2002, Plaintiff reported to Belington Clinic with complaints of recurrent chest pain. Plaintiff stated he had experienced "pressure type sternumal chest pain" that had persisted for two (2) weeks (R. 145). Exertion would bring it on. Plaintiff was advised to go to the hospital for his condition (R. 144).

Plaintiff was admitted to Davis Memorial Hospital, located in Elkins, West Virginia, on September 10, 2002, for "chest pain." The admission report of John Henderson, M.D., also noted Plaintiff was "brought in for further evaluation . . . due to the fact that he had a history of hypertrophic cardiomyopathy." The laboratory data was for the following: 1) "CBC was unremarkable"; 2) electrolytes were within normal limits; 3) "BUN was 15.9"; 4) creatinine was 1.0; 5) "CPKs were negative"; 6) troponin was negative; and 7) "electrocardiogram showed sinus rhythm with lateral ischemia with poor R wave progression." "Myocardial infarction was ruled out" based on the results of the medical tests. Dr. Henderson suggested Plaintiff undergo cardiac catheterization and Plaintiff agreed to the procedure. He was transferred, *via* ambulance, to Monongalia General Hospital, for cardiac catheterization (R. 186).

On September 12, 2002, Plaintiff underwent a coronary angiography examination, which was performed by Morgan H. Lyons, Jr., M.D. Dr. Lyons opined the following: 1) left ventriculogram – wall motion was normal, dimensions were normal, ejection fraction was sixty (60) percent, aortic valve was unremarkable, mitral valve was "1+MR possibly secondary to ventricular ectopic activity," origin of coronary arteries were normal, and the shape of the left ventricular outflow tract did suggest a possible element of subaortic narrowing with mild hypertrophy in this area suspected; 2) aortogram – aortic root was unremarkable, aortic valve was tricuspid, and coronary origin was normal; and 3) coronary angiograms – left main coronary artery was normal, left anterior descending was normal, circumflex artery was normal, and right coronary artery was anatomically dominant and normal (R. 209-10). Dr. Lyons found Plaintiff had normal coronary arteries, normal left ventricular function, "relatively mild outflow gradient in the subaortic outflow area at rest," normal right heart catheterization, and "hypertrophic cardiomyopathy with dynamic outflow traction by previous history

and by echocardiographic determination." Dr. Lyons recommended medical therapy for Plaintiff's hypertrophic cardiomyopathy, which should be followed on an outpatient basis (R. 210).

On September 23, 2002, a state-agency physician completed a Physical Residual Functional Capacity Assessment ("RFC") of Plaintiff. Hugh M. Brown, M.D., found Plaintiff could occasionally lift and/or carry twenty (20) pounds, frequently lift and/or carry ten (10) pounds, stand and/or walk for a total of about six (6) hours in an eight (8) hour workday, sit for a total of about six (6) hours in an eight (8) hour workday, and push and/or pull unlimited (R. 220). Dr. Brown found Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations (R. 221-23).

On October 3, 2002, Plaintiff presented to Belington Clinic with complaints of right lower leg pain (R. 144).

On April 14, 2003, Plaintiff reported to the emergency department of Davis Memorial Hospital with complaints of "severe shortness of breath with cough and hemoptysis" (R. 254, 271). Plaintiff stated he had become short of breath in September, 2002, when he "was found to be in heart failure." Plaintiff informed Carl High, M.D., that he had "been stable on medications" since he had had a catheterization at Monongalia General Hospital. Plaintiff stated his cough had produced a "whitish to brown sputum" plus hemoptysis and that a recent chest x-ray showed he had pneumonia. Plaintiff was observed with "coughing up fairly large amounts of bright blood" at the emergency department of the hospital. Plaintiff was admitted to "CCU" after having been administered Lasix and antibiotics in the emergency department (R. 254).

Plaintiff informed Dr. High that he was taking Lopressor 25 mg., aspirin, and Bextra 20mg. Plaintiff stated he was not experiencing anginal chest pain. Plaintiff's chest examination showed

"scant inspiratory and expiratory wheezes." Plaintiff's heart tones were "regular with a mid-systolic murmur heard." Plaintiff's spine examination was negative, his extremity exam showed adequate distal pulsations, and his neurologic exam was grossly negative (R. 254).

Dr. High's admitting impression was for "acute onset of dyspnea with massive infiltrates reported on chest x-ray"; cardiomyopathy; and possible pneumonia. Dr. High noted that "[w]ith the frank hemoptysis I need to be worried about pulmonary embolus." Dr. High started Plaintiff on Heparin and Lasix IV and ordered pulmonary and cardiology consultations (R. 255).

An April 14, 2003, chest x-ray showed "what looks like consolidation in both lungs in upper part, which appears quite extensive" which was "suggestive of inflammatory pathology or pneumonia" (R. 265).

A second chest x-ray that same day showed: 1) "widening of the mediastinum . . . due to mediastinal fat"; 2) "pulmonary infiltration is alveolar consolidation, which could be due to pulmonary edema or inflammatory process, but its rapid development could favor pulmonary edema . . . because bilateral pleural fluid is associated and the heart size is prominent;" and 3) "no gross pulmonary embolus . . ." (R. 264).

Also on April 14, 2003, Plaintiff underwent a consultative examination by Jerry Pondo, M.D. Dr. Pondo noted Plaintiff's "repeated chest x-ray showed increased infiltrates in both upper lung zones" (R. 271). His impression was for "bilateral infiltrates – pneumonia persists" and congestive heart failure, but recommended an "echocardiogram and chest CT with IV contrast to rule out PE or aortic aneurysm" (R. 272).

On April 15, 2003, Plaintiff underwent a third x-ray of his chest. It showed "extensive bilateral pulmonary infiltration with change in its distribution . . ." (R. 263).

11

On April 16, 2003, a "duplex extremity bilateral" ultrasound was taken of Plaintiff. Frank Kadel, D.O., interpreted the test result as showing "negative ultrasound for DVT" and "mild reflux throughout the deep venous system" (R. 262).

On April 17, 2003, Plaintiff underwent a fourth chest x-ray. Dr. Khatter compared this x-ray to the April 14, 2003, and April 15, 2003, x-rays and interpreted it as showing "bilateral pulmonary infiltration has appreciably cleared, though not completely yet" (R. 261).

On April 18, 2003, Plaintiff was discharged from Davis Memorial Hospital with the following instructions: 1) perform activity as tolerated; 2) follow diet as tolerated; 3) and report for a one-week follow-up examination with Dr. High. Plaintiff was prescribed "KCL 20MEQ," Albuterol hand-held nebulizer, Lasix 80mg, Lopressor 25 mg, Ecasa, and Ceftin 500mg (R. 256)

At the administrative hearing held on May 6, 2003, Plaintiff testified he had been diagnosed with hypertrophic cardiomyopathy (R. 312). He stated he had had three herniated disks, for which he had undergone surgery in June 2002. Plaintiff testified that he still had "minimal movement" through his neck and right shoulder pain (R. 313). Plaintiff testified he experienced migraine headaches and still had "problems" with carpal tunnel syndrome to the extent that he had difficulty opening or even picking up a bottle (R. 314). Plaintiff stated he experienced pain in his knee, which did not interfere with his routines (R. 316). Plaintiff testified he had been treated in April 2003 for congestive heart failure and pneumonia (R. 317). He had not seen Dr. Lyons for a "couple of months," but testified he was to be examined by him the week following the administrative hearing to discuss heart surgery. The ALJ noted he would leave the record open for twenty (20) days relative to the outcome of that evaluation (R. 320). Plaintiff stated he had asthma and that perfumes, gasoline, and bleach "smothered" him and caused him to cough and become light headed (R. 321).

Plaintiff testified he had undergone four (4) surgeries for repair of five (5) hernias and that he experienced pain from walking or lifting (R. 322).

Plaintiff testified he drove thirty (30) miles in a typical week (R. 311). He stated he could walk thirty (30) yards or up to fifty (50) yards at the most before he became tired and felt his "heart getting pounding" (R. 315). Plaintiff testified he could stand for a "short while" before becoming tired. Plaintiff stated he was "not allowed to do any lifting, anything to over exert" himself because of his hypertrophic cardiomyopathy (R. 316). Plaintiff testified he had fished three (3) times "this year" and had hunted during the past hunting season as follows: 1) doe hunted once; 2) muzzle-load hunted once; and hunted four (4) days during the first week of buck season (R. 319-20). Plaintiff stated he did not perform yard work, but had planted corn using a hand-held planter (R. 320).

At the administrative hearing, the ALJ asked the VE the following hypothetical question: "Please assume a younger individual with a high school education. Preclude [sic] from performing all but sedentary work in a controlled environment with no hazards. And work primarily entailing gross grasping strength as opposed to fine manipulation. With those limitations can you describe any work this hypothetical individual can perform?" The VE responded: "Under the sedentary exertional level dispatcher/router. 111,000 nationally. 9,000 regionally. Surveillance monitor. 97,000 nationally. 1,900 regionally. Telephone answer service operator. 210,000 nationally. 3,100 regionally." The ALJ then asked: "Are those jobs consistent with the DOT?" The VE answered: "Yes, they are, Your Honor" (R. 323). The ALJ again stated he would hold the record open in order for Dr. Lyons to submit evidence regarding the status of Plaintiff's cardiac condition.

On May 15, 2003, Dr. Lyons wrote a letter relative to Plaintiff's condition. He stated he had performed a catheterization and echocardiograms of Plaintiff. He opined that Plaintiff had

"documented hypertrophic cardiomyopathy with subaortic outflow obstruction." He noted that this "particular condition is a dynamic process that can worsen with exertion." Dr. Lyons stated that Plaintiff's April 2003 hospitalization was for "decompensation," which "was related to an episode following exertion." Dr. Lyons opined that Plaintiff was not a "candidate for significant physical exertion." Dr. Lyons stated that, even though Plaintiff was currently "undergoing evaluation and treatment," there was "no guarantee or even expectation that he would improve sufficiently over the next year" to become "a candidate for his current occupation" as a corrections officer (R. 278).

### New Evidence to the Appeals Council

On October 30, 2003, Dr. Lyons completed a Congestive Heart Failure Medical Assessment Form (R. 302). Dr. Lyons checked the "Yes" box for the question: "Does your patient exhibit congestive heart failure." He also noted Plaintiff's diagnosis of hypertrophic cardiomyopathy and opined that his prognosis was fair. He observed Plaintiff's symptoms to be exertional dyspnea, history of pulmonary edema, and exercise intolerance. He specifically did not find Plaintiff had chest pain, weakness, arrhythmia, angina equivalent pain, palpitations, orthopnea, rest dyspnea, chronic fatigue, loss of endurance or dizziness. Dr. Lyons noted the positive clinical finding and test result was for hypertrophic cardiomyopathy as determined by Plaintiff's heart catheterization. Dr. Lyons then noted Plaintiff exhibited angina as exertional chest pain and that the episodes occurred "by history" (R. 302). Dr. Lyons found Plaintiff's symptoms interfered with his attention and concentration frequently (R. 302-03). He opined that if Plaintiff were placed in a competitive job, he would be unable to perform or be exposed to: routine, repetitive tasks at a consistent pace; fast-paced tasks; and to work hazards (e.g., heights or moving machinery). He found Plaintiff's side effects of medication included dizziness and diuresis. Dr. Lyons opined Plaintiff's impairment

14

lasted or could last at least twelve (12) months. Dr. Lyons then opined Plaintiff had the following limitations: 1) He could walk less than one (1) city block before he experienced pain or needed to rest; 2) He could sit for more than two (2) hours at one time and had to stand after sitting; 3) He could stand for up to forty-five (45) minutes and had to sit after standing; and 4) He could sit for about two (2) hours and stand for less than two (2) hours in an entire eight (8) hour workday (R. 303). Dr. Lyons opined Plaintiff needed to take four (4) unscheduled breaks for less than twenty (20) minutes each for angina, palpitations, shortness of breath, and weakness. He found Plaintiff's leg needed to be elevated because of edema. Dr. Lyons found Plaintiff could never lift and carry even ten (10) pounds. He determined Plaintiff could never stoop and could rarely twist (R. 304). Dr. Lyons opined it was "unknown" the frequency with which Plaintiff would be absent from work due to his impairments and/or treatments (R. 305). He described Plaintiff's other limitations that would affect his ability to work at a regular job on a sustained basis as: "Functionally dynamic problem that increases with activity/exertion."

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ Slahta made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(b) and 416.920(b).

4. These medically determinable impairments do not meet or medically equal

one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7.  The claimant has the following residual functional capacity: claimant can perform sedentary work in a controlled environment; that requires no exposure to hazards (unprotected heights, dangerous or moving machinery, etc.); and involves gross grasping rather than fine manipulation.

8.  The claimant is unable to perform any of his past relevant work (20 CFR §§ 404.1565 and 416.965).

9.  The claimant is a "younger individual" (20 CFR §§ 404.1563 and 416.963).

10. The claimant has a "high school (or high school equivalent) education" (20 CFR §§ 404.1564 and 416.964).

11. The claimant has no transferable skills from skilled work previously performed as described in the body of the decision (20 CFR §§ 404.1568 and 416.968).

12. The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR § 416.967).

13. Although the claimant's exertional limitations do not allow him to perform the full range of sedentary work, using Medical-Vocational Rule 201.28 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as a dispatcher, of which there are 111,000 positions in the national economy and 9,000 positions regionally; a surveillance monitor, of which there are 97,000 positions in the national economy and 1,900 positions regionally; and a telephone answering service operator, of which there are 210,000 positions in the national economy and 3,100 positions regionally. The vocational expert testified that these jobs are consistent with the DICTIONARY OF OCCUPATIONAL TITLES (DOT).

14. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Plaintiff's Contentions

Plaintiff contends:

1.   The ALJ failed to develop a full and fair record.

2.   The vocational expert's testimony conflicts with the dictionary of occupational titles.

3.   Alternatively, the Court should remand this case in accordance with the Fourth Sentence of § 405(g) in light of the Appeals Council's failure to explain its treatment of new and material evidence.

## C. Duty to Properly Develop the Record

Plaintiff first argues that the ALJ failed to develop a full and fair record regarding his cardiac condition. Doctors first discovered Plaintiff's cardiac condition during the work-up for his cervical surgery. His EKG showed lateral ischemia and he was therefore referred to cardiologist S.M. Reddy, M.D. (R. 165). Plaintiff complained to Dr. Reddy of chest pain with no set pattern and chest pain the prior Saturday lasting "only a few seconds, non-exertional." Plaintiff believed he had pain with aggravation and at the work place. Dr. Reddy found no history of myocardial infarction or congestive heart failure, PND or orthopnea. Plaintiff was taking no medications.

Plaintiff underwent a stress test after which Dr. Reddy wrote:

> Mr. Pine had stress echo which did show evidence of hypertrophic obstructive cardiomyopathy. His gradients were about 65 mmHg at rest, did go up to 223 post exercise. The patient *is completely asymptomatic* from a cardiac point of view. The patient thinks *he does a fair amount of exertional activity at his work place.* The patient *never had any dizziness or syncopal episodes* and no family history of sudden cardiac death. The patient does not believe that anybody in his family has hypertrophic cardiomyopathy. The patient was able to walk 5 minutes with no cardiac symptoms. The patient does have good LV systolic function and he had moderate concentric left ventricular hypertrophy. The patient is cleared for surgery with acceptable risks but I do suggest to put him on telemetry during postoperative period and avoid dehydration, volume depletion, and tachycardias.
>
> If you do need any assistance during the perioperative period, please do not hesitate to call me. I also spoke to the patient at length about the natural history of his hypertrophic cardiomyopathy. I advised the patient *not to do any severe exertional work* and call me if he has any dizziness. I also suggested to take his children to his family doctor for evaluation of hypertrophic cardiomyopathy. I am going to see him back in six months.

(R. 162)(emphasis added).

Plaintiff's surgery was without incident. He underwent a postoperative consultative examination on June 14, 2002, with Dr. Lopez, who stated:

> The patient is a 40-year old gentleman who had been evaluated by Dr. Reddy for

18

some palpitations and chest pain prior to his surgery. Dr. Reddy performed a stress echocardiogram which showed *no ischemia* but did reveal significant left ventricular hypertrophy and evidence for a hypertrophic obstructive cardiomyopathy. Resting gradient across the left ventricular outflow track showed a peak of 67 mmHg, a mean of 32 mmHg. With exercise the gradients did increase to greater than 220 mmHg. *The patient has otherwise however been fairly active without any significant problems. He has never had any syncope or dizziness* . . . . Patents with hypertrophic cardiomyopathy can have a tendency for arrhythmias, heart failure, and hypotension, where they are to become volume depleted [sic]. *Overall, however, at the present time, he looks hemodynamically stable.* We will just follow along clinically.

(R. 175)(emphasis added). Dr. Lopez's diagnosis was postoperative from spinal cord surgery, hypertrophic obstructive cardiomyopathy – clinical [sic] stable; and history of palpitations and chest pain with recent *negative stress echocardiogram for ischemia*.

The State agency referred Plaintiff for an examination on September 5, 2002 (R. 177). Plaintiff complained of a "substernal sharp to almost dull pain or sensation of something 'pushing against' something in the chest that occurs a couple of times per week, lasts 15 to 20 minutes at a time [and is] associated with arm achiness and tiredness and *seems to occur following exertion such as mowing*." (Emphasis added).

Plaintiff had no hypertension, no dyspnea on exertion, no orthopnea, and no paroxysmal nocturnal dyspnea. Plaintiff was still on no medications. He reported no shortness of breath. Dr. Bear diagnosed "chest pain *with exertional component*, cannot entirely rule out angina" and "[r]eported history of hypertrophic cardiomyopathy" (R. 181). He found no appreciable congestive heart failure, and noted Plaintiff was not dyspneic on exertion.

Five days later Plaintiff presented to the hospital with complaints of chest pain and palpitations for two weeks (R. 145, 186). Cardiologist Dr. Lyons recommended cardiac catheterization. Dr. Lyons reported the cardiac catheterization showed normal coronary arteries,

normal left ventricular function, relatively mild outflow gradient in the subaortic outflow area at rest, normal right heart catheterization, and hypertrophic cardiomyopathy with dynamic outflow traction by previous history and by echocardiographic determination (R. 210). His only recommendation was medical therapy for hypertrophic cardiomyopathy.

Two separate State agency reviewing physicians opined Plaintiff could occasionally lift/carry 20 pounds and frequently lift/carry ten pounds (R. 220). The record shows they had reviewed the evidence up through the September 10, 2002 examination.

There are no records of any medical evaluations, tests, or office visits for heart problems from September 12, 2002, until April 14, 2003.

On April 14, 2003, Plaintiff presented to the hospital with complaints of shortness of breath with cough and hemoptysis (R. 254). He had been stable on medications since September 2002. A chest x-ray indicated pneumonia. Plaintiff denied anginal chest pain or palpitations. He was not taking Nitroglycerin. Plaintiff underwent a consultative examination (R. 271). The preliminary impression was "bilateral infiltrates – pneumonia persists" and "congestive heart failure" (R. 272). He was hospitalized and started on medications.

An April 17, 2003 x-ray indicated the bilateral pulmonary infiltration had appreciably cleared, though not completely yet (R. 261).

During the administrative hearing on May 6, 2003, Plaintiff testified he had not seen Dr. Lyons, his cardiologist for "a couple months," but he was scheduled to see him the next week. The ALJ left the record open specifically for additional evidence from Dr. Lyons. On May 15, 2003, Dr. Lyons wrote the following "To Whom it May Concern" letter:

> Mr. Dennis Pine has been followed in our cardiology office. I have performed catheter-based evaluation in the past as well as echocardiographic evaluation in the

past and repeat echocardiographic evaluation recently. Mr. Pine has documented hypertrophic cardiomyopathy with subaortic outflow obstruction. This particular condition is a dynamic process *that can worsen with exertion*. Mr. Pine has been having significant *symptoms of exertion related nature* for what I believe is related to this illness. Recently Mr. Pine was hospitalized with his decompensation. While this may well relate to a rhythm disturbance in addition to his underlying condition, *a fundamental issue is that Mr. Pine's hospitalization was related to an episode following exertion*. With this in mind, I do not feel that Mr. Pine is currently a candidate for *significant physical exertion*. The potential of which is a significant possibility given [sic] his current occupation.

Mr. Pine is in the process of undergoing evaluation and treatment. There is however no guarantee or even expectation that he would improve sufficiently over the next year that he would be a candidate for his current occupation.

If there are specific questions regarding the above, please feel free to contact my office directly.

(Emphasis added).

The above evidence was the sole evidence before the ALJ. The ALJ accorded "great weight" to Dr. Lyons' opinion regarding Plaintiff's inability to perform his past work (R. 27). Plaintiff's former work as a police officer/correctional officer was determined to be at the medium exertional level. The ALJ determined, however, that Plaintiff was capable of sedentary level work. This finding is supported by the evidence before the ALJ. Both State agency physicians found Plaintiff could actually work at the light level. Further, Plaintiff himself testified he hunted four days the first week of buck season, one day during doe season, and one day during muzzle loader season (R. 320). He assisted with planting the family garden by operating a hand-held seeder (R. 320). These activities are not consistent with a finding of total disability. In Plaintiff's application he stated only that he could not lift, run, exercise or over-exert himself. (R. 86). No doctor opined that Plaintiff could not work. His treating cardiologist opined that his symptoms were exertion-related and that it was "fundamental" that his hospitalization "was related to an episode following exertion."

Plaintiff told examining physician Beard that his symptoms seemed to occur following exertion such as mowing.

Plaintiff argues that the ALJ was required to inquire of Dr. Lyons as to whether Plaintiff could work at any exertional level. The undersigned does not agree. Plaintiff was referred for a consultative examination, and also had two State agency physicians review his record. Further, the undersigned finds it clear that Dr. Lyons was only precluding Plaintiff from work that required much greater exertion than sedentary-level work. He specifically opined that Plaintiff's symptoms were exertional-related. There was therefore no need for the ALJ to recontact him regarding his opinion.

The undersigned therefore finds the ALJ did meet his responsibility to fully develop the record. The undersigned also finds substantial evidence supports the ALJ's determination, based on the evidence before him, that Plaintiff was not disabled at the time of the decision.

### D. Conflict between VE testimony and DOT

Plaintiff next argues that the VE's testimony conflicts with the DOT. Plaintiff cites Social Security Ruling ("SSR") 00-4p for the proposition that "whenever a vocational expert's testimony conflicts with the DOT, the adjudicator must obtain a reasonable explanation for the apparent conflict." This is not a quite correct reading of the Ruling, however. SSR 00-4p actually provides, in pertinent part:

> Occupational evidence provided by a VE or VS *generally* should be consistent with the occupational information supplied by the DOT. When there is *an apparent unresolved conflict* between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled.

(Emphasis added). The Ruling continues:

> When a VE or VS provides evidence about the requirements of a job or occupation,

the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will:
Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and
*If the VE's or VS's evidence appears to conflict with the DOT*, the adjudicator will obtain a reasonable explanation for the apparent conflict.

(Emphasis added). Here the VE named the jobs of sedentary exertional level dispatcher/router, telephone-answering-service operator, and surveillance monitor. The ALJ did ask the VE if those jobs were consistent with the DOT, and the VE responded they were. There were no *apparent* conflicts between the VE's testimony and the DOT. The ALJ therefore fulfilled his duty under SSR 00-4p.

Even if there is not an apparent conflict, however, Plaintiff contends that the VE's testimony actually conflicts with the DOT. If correct, substantial evidence would not support the ALJ's determination that a significant number of jobs existed in the national and regional economy.

Plaintiff first argues the job of surveillance system monitor is a governmental service position only, entailing monitoring public transportation terminals to detect crimes or disturbances. Plaintiff cites to the Tenth Circuit case *Shoaf v. Apfel*, 211 F.3d 1279 (10th Cir. 2000)(unpublished) in support of his argument. In *Shoaf*, the VE at the hearing testified there were 850 surveillance system monitor jobs in the area in which Plaintiff lived. She testified she relied on the DOT for her description of the job. Shoaf argued the DOT described the job as monitoring the premises of public transportation terminals and submitted to the court new evidence consisting of a second vocational expert's report. The second VE reported that he had surveyed rail, bus, and air transportation in the area and found that none used surveillance system monitors.

The Tenth Circuit held:

> The fact that there may not be any of these positions near where Ms. Shoaf lives is not a problem *per se* . . . .What we do see as a problem is the striking conflict between the two experts' opinions regarding the existence of these positions in the area, presenting the possibility that they are not talking about the same position. Considering that the position is limited to monitoring public transportation systems (and does not include, for example, office buildings), Dr. Bopp's opinion does not appear on the surface to be out of line, and it raises questions about the reliability of Ms. Lumpe's testimony . . . . Moreover, it does not appear that either the experts' opinions of the ALJ's analysis focused on the existence of these jobs in 1985, the relevant time frame. At the hearing in 1996, the ALJ's questions and Ms. Lumpe's answers regarding the jobs Ms. Shoaf could perform were all in the present tense, as was Dr. Bopp's report. . . . .

> Thus, while there does not appear to be good cause for Ms. Shoaf's failure to present this vocational evidence to the Commissioner, ***because we conclude a remand is in order on the credibility issue***, we think it would be appropriate for the Commissioner to consider this vocational evidence as well . . .

*Id* (emphasis added).

The undersigned does not believe *Shoaf* applies to the case here. First, the 10th Circuit did not reverse and remand the decision solely based on the VE evidence, but was remanding it due to an error in the ALJ's credibility analysis. Second, what the court found significant was the "striking conflict" between the two experts. There is no such conflict here. Third, the court left open the possibility that the position "surveillance system monitor" may also have included office buildings. Finally, and most importantly, the Court was concerned because both VE's appeared to be speaking of jobs that existed in 1996, whereas they should have been looking at jobs that existed in 1985. None of these issues appear in the present case. It is significant that *Shoaf* is an unpublished case, and a search shows that, in the more than five years since it was decided, not one court has cited to it, even in the 10th Circuit. Further, a search has turned up only one other case addressing this precise issue, and that case is an unreported District of New Hampshire case in which Chief Judge

24

Barbadoro stated:

> Moreover, I do not agree with Wilcox's assertion that there are discrepancies between the VE's testimony and the DOT. First, Wilcox asserts that the DOT identified surveillance system monitor as a "government service" job, which conflicts with the VE's testimony describing a private sector job. A more close examination, however, reveals that the DOT's industry designation shows "in what industries the occupation was studied but does not mean that it may not be found in others." Dictionary of Occupational Titles, XXI (4th ed., rev. Vol. I 1991). "Therefore, industry designations are to be regarded as indicative of industrial location, but not necessarily restrictive." *Id.*

*Wilcox v. Barnhart*, 2004 WL 1733447, 2004 D.N.H. 115. The undersigned agrees with Chief Judge Barbadoro's interpretation of the DOT.

Even if the surveillance monitoring job were not available, the VE named two other jobs available in significant numbers in the national and regional area. Plaintiff, however, contends both these jobs also conflict with the DOT. Plaintiff contends the telephone answering service operator job appears in the DOT as a semi-skilled job. Plaintiff does not, however, state in what way this is a conflict. The ALJ did not limit Plaintiff to unskilled jobs. He found Plaintiff had no transferable skills from his former jobs, but that does not mean he cannot perform semi-skilled or even skilled work. Plaintiff was only 41 years old and has a high school education. The undersigned finds there is therefore no conflict between the DOT and the job of telephone answer service operator. Further, the VE testified there are 3,100 such jobs in the region, a significant number on its own.

Because the two jobs already discussed are substantial evidence supporting the ALJ's determination that a significant number of jobs are available in the national and regional economy that Plaintiff could perform, it is not necessary, and the undersigned does not reach the merits of Plaintiff's argument regarding the third job the VE named, that of dispatcher/router.

### D. New Evidence to the Appeals Council

Plaintiff argues the case should be remanded in light of the Appeals Council's failure to explain its treatment of new and material evidence. The ALJ entered his decision on July 8, 2003, after having received additional evidence from Plaintiff's treating cardiologist, Dr. Lyons. On October 30, 2003, Dr. Lyons completed a "Congestive Heart Failure Medical Assessment Form" (R. 302-305). He noted Plaintiff's diagnosis of hypertrophic cardiomyopathy, and opined his prognosis was "fair." He also indicated by a check mark that Plaintiff exhibited congestive heart failure. He listed Plaintiff's only symptoms as exertional dyspnea, a history of pulmonary edema, and exercise intolerance. He expressly declined to check off boxes indicating Plaintiff had chest pain, weakness, angina equivalent pain, palpitations, orthopnea, rest dyspnea or dizziness. He described the nature, location, and radiation of symptoms only as "exertional chest pain." The only positive clinical finding or test result was: Hypertrophic cardiomyopathy by heart cath 9/12/02.

Dr. Lyons then found Plaintiff "frequently" experienced symptoms that interfered with attention and concentration needed to perform even simple work tasks during a typical workday, but further opined that if Plaintiff were placed in a competitive job, the only aspects of workplace stress he would be unable to perform or be exposed to were routine, repetitive tasks at a consistent pace, fast-paced tasks (e.g., production line), or work hazards such as heights or moving machinery (R. 303). Dr. Lyons noted that side-effects of Plaintiff's medication included diuresis and dizziness.

With regard to Plaintiff's functional limitations, Dr. Lyons opined that Plaintiff could walk without rest less than one city block and stand/walk for less than two hours during an eight-hour workday. He opined Plaintiff could continuously sit for more than two hours, but then later opined he could sit for only about two hours during a total eight-hour workday. He anticipated Plaintiff

would need up to four unscheduled breaks during an eight-hour workday, lasting 20 minutes each due to symptoms of angina, palpitations, shortness of breath, and weakness. He found Plaintiff should never lift ten pounds, never stoop (bend), and rarely twist. He was unable to say how often Plaintiff was likely to be absent from work as a result of his condition (R. 305). There was no further explanation for any of these limitations, and no records attached to the form.

In *Wilkins v. Secretary*, 953 F.2d 93 (4th Cir. 1991), the Fourth Circuit determined that the Appeals Council will consider evidence submitted to it if the evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision. *Wilkins* further defined the terms "new" and "material" as follows:

> Evidence is new . . . if it is not duplicative or cumulative . . . .
> Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome.

*Id.* at 96.

The undersigned finds part of the Congestive Heart Failure Medical Assessment Form is "new" and relates to the period at issue. The ALJ already had a significant amount of evidence regarding Plaintiff's hypertrophic cardiomyopathy, and the test relied on by Dr. Lyons was discussed in the ALJ's decision. The fact that the symptoms were exertionally-based is also already in the record before the ALJ. The undersigned finds the limitations Dr. Lyons indicated Plaintiff had were new, however. In fact, the Appeals Council stated it did consider the evidence and included it in the transcript, further evidencing the fact that the evidence was new and related to the relevant time period. The Appeals Council found, however, that the evidence did not provide a basis for changing the ALJ's decision and therefore denied review.

Plaintiff argues the claim should be remanded because the Appeals Council "considered" the

new, interim evidence, but did not provide its reasoning in finding the evidence did not justify further administrative action, citing *Alexander v. Apfel*, 14 F. Supp. 2d 839 (W. D. Va. 1998). The undersigned recognizes this issue has generated conflicting opinions in the District Courts of the Fourth Circuit. First, the regulations do not require the Appeals Council to state its rationale for denying review. *See* 20 C.F.R. § 404.970(b). Second, *Alexander* is of questionable precedential value, as it is a decision from another district, the Western District of Virginia. Third, in an unpublished opinion decided *after Alexander*, the Fourth Circuit specifically rejected the contention that the Appeals Council must articulate its own assessment of the additional information. *See Hollar v. Commissioner of Social Security*, 194 F.3d 1304 (4th Cir. 1999)(unpublished), *cert. denied*, 120 S. Ct. 2228 (2000) (*citing Browning v. Sullivan*, 958 F. 2d 817 (8th Cir. 1992), 20 C.F.R. § 404.970(b)). *cf., Harmon v. Apfel*, 103 F. Supp. 2d 869 (D.S.C. 2000) (court declined to follow *Hollar* and instead required the Appeals Council to articulate its reasoning in declining review where new evidence was submitted.). Finally, a subsequent decision in the Western District of Virginia concluded the exact opposite of the magistrate judge in *Alexander*. In *Ridings v. Apfel*, 76 F. Supp. 2d 707 (W.D. Va. 1999), which was decided *after Alexander*, District Judge Jones held that the Appeals Council was *not* required to state its reasons for finding that the new evidence did not justify review of the ALJ's decision. Judge Jones expressly disagreed with the magistrate judge's reasoning that the Appeals Council must give a detailed assessment of its failure to grant review in the face of new evidence, citing *Hollar*.[3]

Despite holding that the Appeals Council was not required to articulate its reasoning for

_____

[3]Judge Jones did cite *Alexander* in a footnote, stating: "At least one other magistrate judge of this district has held that the Appeals Council must articulate some reason for finding that the new evidence does not justify review." *Id.* at n.6.

denied review, Judge Jones affirmed the magistrate judge's recommendation that Ridings' claim be remanded to the Commissioner, because "substantial evidence [did] not support the ALJ's decision, *when reviewed along with [the new evidence]*." *Id.* at 709. (Emphasis added).

The undersigned therefore finds the Appeals Council did not commit reversible error by failing to explain its reasons for denying review.

The Fourth Circuit in *Wilkins* held as follows:

> Because the Appeals Council denied review, the decision of the ALJ became the final decision of the Secretary. "Reviewing courts are restricted to the administrative record in performing their limited function of determining whether the Secretary's decision is supported by substantial evidence." The Appeals Council specifically incorporated [the new evidence] into the administrative record. Thus, we must review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the Secretary's findings.

*Wilkins v. Secretary*, 953 F.2d at 96 (internal citations omitted). Therefore, where, as here, the Appeals Council considered the new evidence and included it in the record but denied review, the Fourth Circuit holds that the reviewing court should consider the record as a whole, including the new evidence, in order to determine whether the ALJ's decision is supported by substantial evidence. This procedure is also consistent with Judge Jones' decision in *Ridings*.

Dr. Lyons is Plaintiff's treating cardiologist. The ALJ had before him all the evidence of Plaintiff's treatment for and evaluation of his heart condition. The only "new" evidence consisted of the limitations Dr. Lyons opined Plaintiff would have due to his condition. He opined Plaintiff would "frequently" experience symptoms which interfere with the attention and concentration needed to perform even simple work tasks during a typical work day. He also opined Plaintiff could walk less than one city block without rest or severe pain, could sit less than two hours in an eight-hour day, and could stand/walk less than two hours in an eight-hour day. He would need to take

29

unscheduled breaks of 20 minutes each four times a day due to shortness of breath, angina, weakness, and palpitations. These limitations would preclude any work, even at the sedentary level.

In *Craig v. Chater*, 76 F.3d 585, 590(4th Cir. 1996), the Fourth Circuit held:

> Circuit precedent does not require that a treating physician's testimony "be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
> > [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.
>
> By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

The undersigned finds Dr. Lyons' opinion regarding Plaintiff's limitations is not well supported by the evidence and is inconsistent with other substantial evidence in the case record. First, Dr. Lyons, as well as all Plaintiff's other physicians, has consistently opined Plaintiff's symptoms were exertional-based. Dr. Lyons even states in the form at issue that Plaintiff had a "Functionally dynamic problem that increases with activity/exertion" and that his chest pain was "exertional." He expressly does not find Plaintiff has symptoms of chest pain, weakness, angina equivalent pain, palpitations, or dizziness, but then later states he would need breaks due to angina, palpitations, shortness of breath, and weakness. The record does not support a finding that Plaintiff would need breaks due to angina, palpitations, shortness of breath or weakness. The only evidence in the record of significant shortness of breath or dyspnea is from April 2003, when Plaintiff was hospitalized with pneumonia. Upon his discharge on April 18, 2003, however, his only limitations were: 1) perform activity as tolerated; 2) follow diet as tolerated; 3) and report for a one-week

follow-up examination with Dr. High. This was less than three weeks before the administrative hearing. Also in April 2003, Plaintiff stated he had no anginal chest pain, and that he had been stable since September 2002. A review of the record shows no complaints of weakness and a report of only occasional palpitations.

Dr. Lyons also states Plaintiff can sit continuously for more than two hours, but later says he can sit only about two hours in an entire eight-hour workday. There is no evidence in the record and no explanation in the form supporting any limitation on sitting, however, especially a limitation of only two hours total in an eight-hour workday.

The undersigned therefore finds Dr. Lyons' opinion regarding Plaintiff's limitations may properly be accorded little weight. As the opinion is inconsistent with other substantial evidence in the record, including Plaintiff's own statements and activities, the undersigned also finds the new evidence would not reasonably have changed the ALJ's decision.

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's decision that Plaintiff was not disabled at any time through the date of his decision.

## VI.  RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** Plaintiff's Motion for Summary Judgment be **DENIED**, and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy

of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send an authenticated copy of this Report and Recommendation to counsel of record.


Respectfully submitted this **4** day of September, 2005.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE